IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESUS LOPEZ CHAVEZ,<br><br>　　　　　　Petitioner,<br><br>　vs.<br><br>BEN CURRY,<br><br>　　　　　　Respondent. | No. C 09-2521 LHK (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner proceeding *pro se*, sought a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging a 2007 decision by the California Board of Parole Hearings ("Board") finding him unsuitable for parole. Respondent was ordered to show cause why the writ should not be granted. Respondent has filed an answer, along with a supporting memorandum of points and authorities and exhibits. Petitioner then filed a supplemental brief, and Respondent filed a supplemental answer. For the reasons set forth below, the petition for a writ of habeas corpus is DENIED.

## BACKGROUND

On May 1, 1992, Petitioner was with co-defendants Dominguez and Duran. (Resp. Ex. 3 ("Tr.") at 23.) Duran set up a meeting with Horace, the victim, in which both parties agreed that Petitioner and his friends would sell one kilo of cocaine to Horace. (*Id.* at 23-24.) However,

1  Petitioner and his friends never intended to supply cocaine to Horace.  (*Id.* at 24.)  Instead, they
2  planned to meet Horace with a "kilo of bread" which they made to look like cocaine, and
3  exchange it for Horace's money.  (*Id.* at 24-25.)  Duran informed Petitioner of the plan two hours
4  before they were to make the exchange.  (*Id.* at 26.)  Duran knew that Petitioner needed money
5  to pay bills and plan his wedding because, although Petitioner had been working, he was not
6  earning enough money.  (*Id.* at 26-27.)

7  When they picked up Horace, Horace got into the backseat with Petitioner.  (*Id.* at 29.)
8  Horace was supposed to be directing them to drive to his house to get the money for the drugs.
9  (*Id.* at 30.)  However, Petitioner recognized the area that they were in, which was an industrial
10 area with no houses.  (*Id.*)  Duran had given Petitioner $400, and Petitioner began counting it
11 when the car stopped.  (*Id.* at 30-31.)  Duran and Horace were the only ones who knew how to
12 speak English, so Petitioner did not know what they were talking about.  (*Id.* at 31.)  All of a
13 sudden, Horace got out of the car, and then Dominguez got out of the car and started shooting.
14 Petitioner reached under his seat, where he knew there was a .45 caliber semiautomatic gun, laid
15 down in the back seat, stuck his arm out of the window, and also began shooting.  (*Id.* at 31-32.)
16 He ended up firing five or six shots.  (*Id.* at 40.)  Ultimately, Horace died from bullets from the
17 .45.  (*Id.*)

18 In 1993, Petitioner was found guilty of second degree murder with the use of a firearm,
19 and sentenced to 20-years to life.  (Petition at 2.)  Petitioner filed unsuccessful state habeas
20 petitions in all three levels of state court, challenging the denial of his parole.  Petitioner
21 thereafter filed the instant petition.

**DISCUSSION**

A.  <u>Standard of Review</u>

A district court may not grant a petition challenging a state conviction or sentence on the
basis of a claim that was reviewed on the merits in state court unless the state court's
adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as determined by the Supreme
Court of the United States; or (2) resulted in a decision that was based on an unreasonable

1  determination of the facts in light of the evidence presented in the State court proceeding." 28
2  U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law
3  and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong
4  applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340
5  (2003).

6       A state court decision is "contrary to" Supreme Court authority, that is, falls under the
7  first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that
8  reached by [the Supreme] Court on a question of law or if the state court decides a case
9  differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*
10 *(Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme
11 Court authority, that is, falls under the second clause of § 2254(d)(1), if it correctly identifies the
12 governing legal principle from the Supreme Court's decisions but "unreasonably applies that
13 principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may
14 not issue the writ "simply because that court concludes in its independent judgment that the
15 relevant state-court decision applied clearly established federal law erroneously or incorrectly."
16 Id. at 411.  Rather, the application must be "objectively unreasonable" to support granting the
17 writ.  *See id.* at 409.

18      "Factual determinations by state courts are presumed correct absent clear and convincing
19 evidence to the contrary."  *Miller-El*, 537 U.S. at 340.  Under 28 U.S.C. § 2254(d)(2), a state
20 court decision "based on a factual determination will not be overturned on factual grounds unless
21 objectively unreasonable in light of the evidence presented in the state-court proceeding."
22 *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).
23 When there is no reasoned opinion from the highest state court to consider the petitioner's
24 claims, the court looks to the last reasoned opinion.  *See Ylst v. Nunnemaker*, 501 U.S. 797,
25 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n.2 (9th Cir. 2000).  In this case,
26 the last reasoned opinion is that of the superior court denying petitioner's habeas petition.  (Resp.
27 Ex. 2.)

28

B.   October 4, 2007 Board Hearing

Petitioner had been incarcerated for approximately fourteen years at the time of his 2007 parole suitability hearing. Petitioner's minimum parole eligibility date was April 23, 2005. (Tr. at 3.)

Regarding his criminal history, Petitioner relayed that he never got into trouble with the police in Mexico. (*Id.* at 47.) On November 12, 1990, Petitioner received a ticket for a Vehicle Code violation and pleaded guilty. (*Id.*) Petitioner stated the violation was for driving without a license and without insurance, and he spent three days in jail. (*Id.* at 47-48.) On December 1, 1990, Petitioner was caught being an unlicensed driver again, and spent a short time in jail. (*Id.* at 48-50.) Then, in March 1991, Petitioner was arrested for possession of a controlled substance for sale. (*Id.* at 50.) Petitioner explained that he and his friends were walking along and found a bag full of clothes, drugs, three guns, and $2000 near a telephone booth. (*Id.* at 42.) They explained this to the police, and the police released them. (*Id.*) Next, on March 18, 1992, Petitioner was arrested for grand theft of a motor vehicle. (*Id.* at 50.) Petitioner explained that he and his friend saw a car that looked like it had been stolen. (*Id.* at 51.) Petitioner's friend wanted to steal the tires and persuaded Petitioner to help him. (*Id.*) They brought the tires to his friend's house and then came back to the car and began jumping on top of it. (*Id.*) At that point, the police arrived, and they were arrested. (*Id.*) Petitioner was placed on two years of probation. A few months later, Petitioner committed the life offense. (*Id.* at 55.)

Petitioner grew up in Mexico and moved to the United States in 1988 with his father when he was 16 years old. (*Id.* at 46.) Petitioner testified that he is the oldest of five children. (*Id.* at 56.) He also has eight half-siblings. (*Id.*) After his father hit him once, Petitioner moved in with his girlfriend, to whom he planned to marry. (*Id.* at 59.) While he was in Mexico, he went to school until the ninth grade. (*Id.* at 62.) His father died in 2001, and, at the time of the parole hearing, his mother was in the hospital. (*Id.*)

Regarding post-conviction factors, Petitioner had only received one minor disciplinary report in 1994 for possession of inmate manufactured alcohol. (*Id.* at 65.) Petitioner had completed two vocations: small engine repairs and computer refurbishing. (*Id.* at 66.) He also

had worked as a Unit Porter and computer work programmer. (*Id.*) While incarcerated, Petitioner was involved in Narcotics Anonymous and Alcoholics Anonymous. (*Id.*) Petitioner had also achieved his GED. (*Id.* at 68.) The Board noted that Petitioner had been involved in several volunteer efforts in his computer work field, participated in several programs, and received three laudatory chronos from prison officials. (*Id*. at 68-69.)

The most recent psychological evaluation for petitioner was completed in 2007. One part of the risk assessment discussion stated that Petitioner scored in the moderate range on historical factors analyzing future violence, but, combined with clinical and risk management factors, Petitioner's total score placed him in the low range for risk of future violence (Resp. Ex. 2, 2007 Evaluation at 5.) Regarding Petitioner's risk of recidivism, Petitioner scored in the medium range. (*Id.* at 5-6.) The evaluation also noted that Petitioner appeared "mildly glib and immature while continuing to demonstrate a lack of insight into his part in the commitment offense," and resolved that he presented a "moderately low" risk of future violence. (*Id.* at 7.) The evaluation concluded that Petitioner posed "a low likelihood to be involved in a violent offense if released to the free community." (Tr. at 69.)

Petitioner's parole plans included being deported back to Mexico. (*Id.* at 74-75.) The Board recognized many support letters received on behalf of Petitioner, written by his friends and family. (*Id.* at 77-90.) Petitioner also had several job offers and offers of residence available to him when he returns to Mexico. (*Id.* at 84-87.)

Ultimately, the Board denied parole. It found that the offense was carried out in a cruel and callous manner, was calculated, and was committed for a very trivial reason -- financial gain -- in relation to the results of the offense. (*Id.* at 132-34.) The Board also noted that Petitioner had been involved in an escalating pattern of criminal conduct. (*Id.* at 135.) It found that Petitioner had performed very well in prison, acknowledging his achievements and successes, and recognizing that Petitioner had solid parole plans and support. (*Id.* at 135-37.) The Board expressed some concern regarding the psychological evaluation, specifically, Petitioner's risk of recidivism and possession of some antisocial personality traits. (*Id.* at 136.) Finally, the Board commented that it was greatly concerned with Petitioner's lack of insight regarding his

motivation for the commitment offense as well as his lack of remorse. (*Id.* at 139.) The Board stated:

> [B]oth of us thought that we saw a total lack of insight on your part regarding what -- what caused you, what brought you to think the way that you did and participate and then end up taking this man's life. And also, remorse. We believe that you have remorse, but you only have -- we felt in what you exhibited to us that your remorse is for this crime as it relates to you. And really we saw no indications that you really had remorse for this victim and this victim's family, but it was, you know, with your own situation. And a give away was earlier in this hearing when you stated yourself that it was -- unlucky shot for me as you were relating to yourself. And I responded to you by stating it was an unlucky shot for the victim. But that came through loud and clear that you were thinking in terms of this crime and how it only related to you. And it really didn't -- it didn't show any -- any feelings or thoughts about the victim and -- and the people that were left behind for him. Specifically, the Board recalled that while Petitioner appeared remorseful, it was with regard to how the commitment offense affected him rather than remorse for the victim or the victim's family.

(*Id.* at 139-40.)

C. State Court Decisions

Petitioner filed a state habeas petition in superior court. In denying the petition, the state court concluded that there was some evidence that the crime was committed in a dispassionate and calculated manner. (Resp. Ex. 3 at 2.) Petitioner and his friends planned to trick the victim into giving them money in exchange for "bunk" cocaine and armed themselves for the encounter. (*Id.*) Once the victim tried to escape, Petitioner fired his weapon repeatedly through a car window without looking. The court concluded that those factors demonstrated more than that necessary to sustain a second degree murder conviction and support the Board's denial. (*Id.*) In addition, the court found some evidence supporting the denial of parole in the Board's reliance on the psychological evaluation which indicated a medium risk of recidivism. (*Id.* at 3.) Both the California Court of Appeal and California Supreme Court denied Petitioner's subsequent state habeas petitions.

D. Analysis

The Due Process Clause does not, by itself, entitle a prisoner to release on parole in the absence of some evidence of his or her "current dangerousness." *Hayward v. Marshall*, 603 F.3d 546, 555, 561 (9th Cir. 2010) (en banc). Under California law, however, "some evidence" of

current dangerousness is required in order to deny parole. *Id.* at 562 (citing *In re Lawrence*, 44 Cal. 4th 1181, 1205-06 (2008) and *In re Shaputis*, 44 Cal. 4th 1241 (2008)). This requirement gives California prisoners a liberty interest, protected by the federal constitutional guarantee of due process, in release on parole in the absence of "some evidence" of current dangerousness. *Cooke v. Solis*, 606 F.3d 1206, 1213-1214 (9th Cir. 2010).

When a federal habeas court in this circuit is faced with a claim by a California prisoner that his right to due process was violated because the denial of parole was not supported by "some evidence," the court analyzes whether the state court decision reflects "an 'unreasonable application'[] of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(1)-(2)); *see Cooke*, 606 F.3d at 1213. California's "some evidence" requirement was summarized in Hayward as follows:

> As a matter of California law, "the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

*Hawyard*, 603 F.3d at 562 (quoting *Lawrence*, 44 Cal. 4th. at 1191, 1210-14); *see Cooke*, 606 F.3d at 1213-1214 (describing California's "some evidence" requirement).

Here, a primary, though not exclusive, basis for the Board's determination of parole unsuitability was the nature of the commitment offense. The life crime fits two of the regulations' criteria for determining that it was committed in an especially heinous, atrocious or cruel manner. There was evidence that it was "carried out in a dispassionate and calculated manner," § 2402(c)(1)(B), in that Petitioner and his co-defendants lured the victim into believing he was going to receive drugs in exchange for money, they were armed with firearms, and, as the victim was trying to run away, Petitioner and a co-defendant repeatedly fired their weapons at him. Although Petitioner fired his weapon without aiming or looking, the victim died as a result

of shots from Petitioner's firearm. Additionally, Petitioner's role in the crimes was for a very "trivial" motive, § 2402(c)(1)(E), i.e., money.

Significantly, the murder was not the only reason for the unsuitability finding. Even aside from the fact that the commitment offense was especially cruel, and was committed for a trivial motive, there was other evidence that reasonably demonstrated Petitioner was still a current threat to society if released. As the Board observed, the psychological evaluation was not fully supportive of Petitioner's release. The report stated that one assessment rated Petitioner within the medium range for risk of recidivism, though such recidivism does not necessarily include violence. (2007 Evaluation at 5-6.) In addition, the report concluded that, as to a clinical risk assessment, Petitioner presented a "moderately low" risk of future violence.

Moreover, the Board's reliance on Petitioner's lack of insight and remorse is also supported by some evidence. "An inmate's lack of remorse or insight into the nature and magnitude of the offense may be some evidence that he currently poses an unreasonable risk of danger to society. Cal. Code Regs., tit. 15, § 2402(d)(3); *In re Shaputis*, 44 Cal. 4th at 1260. Here, the Board observed that during the hearing, Petitioner mainly spoke about the commitment offense in terms of how it affected him, rather than the victim or the victim's family. During the hearing, Petitioner told the Board that he believed the drug deal would be an easy trick and they would get away with it. (Tr. at 25.) When the Board asked how Petitioner's life ended up where it is, Petitioner merely responded that he was a "stupid kid" and he did not have anyone to teach him right from wrong. (*Id.* at 97-98.) Petitioner said that he committed the commitment offense because he needed the money. (*Id.* at 100.) Further, the psychological report indicated that Petitioner "presented as mildly glib and immature while continuing to demonstrate a lack of insight into his part in the commitment offense." (2007 Evaluation at 7.)

Based on these circumstances, it was not unreasonable for the Board to interpret Petitioner's statements as some evidence of current danger to the community. *See Hayward*, 603 F.3d at 562-63 (concluding that there was "some evidence" of future dangerousness based on the nature of the commitment offense and "the somewhat unfavorable psychological and counselor reports.") Notably, Petitioner has not yet served his sentence. Moreover, while self-help and

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
P:\PRO-SE\SJ.LHK\HC.09\Chavez521hcden.wpd         8

therapy programming count in his favor, it cannot be said that at this point they compel a finding of suitability. There was some evidence to support the Board's denial based on the commitment offense, psychological evaluation, and lack of insight and remorse, and those circumstances were probative of and provided reliable evidence of Petitioner's current dangerousness. These factors indicated "that the implications regarding the prisoner's dangerousness that derive from his [ ] commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety." *See Lawrence*, 44 Cal.4th at 1214. The state court's rejection of petitioner's petition was not an unreasonable application of California's "some evidence" requirement and was not based on an unreasonable determination of the facts in light of the evidence. Petitioner therefore is not entitled to federal habeas relief.

## CONCLUSION

The petition for a writ of habeas corpus is DENIED. Rule 11(a) of the Rules Governing Section 2254 Cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find the denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: __12/21/2010_____     _____*Lucy H. Koh*_____
                                                             LUCY H. KOH
                                                             United States District Judge